UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| vs. | CRIMINAL NO. 3:23-CR-116(OAW) |
| NICHOLAS DEFELICE | October 18, 2023 |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

"[T]he power to tax involves the power to destroy;…the power to destroy may defeat and render useless the power to create…." Chief Justice John Marshall, *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819)

"The [National Firearms Act (NFA)] was originally enacted in 1934. Similar to the current NFA, the original Act imposed a tax on the making and transfer of firearms defined by the Act, as well as a special (occupational tax) on persons and entities engaged in the business of importing, manufacturing, and dealing in NFA firearms." Bureau of Alcohol, Tobacco, Firearms, and Explosive, "*National Firearms Act*," available at https://www.atf.gov/rules-and-regulations/national-firearms-act (accessed 10/12/2023). Accordingly, the NFA does not impose a *per se* ban on firearms and certain subordinate parts—such as silencers or conversion devices—that fall within its purview. It imposes a $200 tax stamp each time regulated items are transferred and requires registration of those parts with the Bureau of Alcohol Tobacco and Firearms (BATF). Similarly, it requires a person to pay for the required license to manufacture and deal in firearms. Nicholas DeFelice is charged with failing to pay these taxes and, as a result, failing to obtain the appropriate licenses.

Nicholas DeFelice was a competitive marksman until he received a target letter from the federal government in June of 2022. He became a competitive target shooter in 2018. DeFelice joined the International Defensive Pistol Association (IDPA) and became an accomplished target shooter. Not unlike a competitive skier and his quiver of skis for the right conditions, DeFelice cycled

through hundreds of guns until he found the ones most suitable to him in a competitive environment that emphasized safety.

Nor did DeFelice just shoot guns as a sport. He viewed them as having aesthetic integrity. When he was not competing, he worked on guns as a craft. The guns he built were works of art—akin to pieces of furniture—and DeFelice was a craftsman. One facet of his craft was Cerakoting, a process by which a ceramic finish is placed on a gun. Not only does it protect the gun from dirt and debris, it changes the aesthetic appeal. Nick was so talented at crafting guns, people wanted to buy them. Proud and open about his craft, he got business cards and advertised on Facebook.

But that all stopped in the Spring of 2022 when Mr. DeFelice received a target letter from the federal government threatening to indict him. Nothing in the law flatly prohibits Mr. DeFelice from possessing these firearms and their parts on simple danger grounds. Instead, the alleged crime is that he neglected to pay the federal government for the privilege of doing so. But where the privilege is a fundamental right flowing directly from the Second Amendment, Mr. DeFelice contends that the government lacks authority to impose such a tax. Accordingly, the relevant provisions of the NFA are inconsistent with our Nation's historical understanding of firearms regulation as required by *New York State Rifle & Pistol Ass'n v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022). The government cannot prove otherwise as a historical matter.

I.      FACTUAL CONSIDERATIONS

This section of the brief is divided into a brief Mr. DeFelice's history a gun owner and craftsman, followed by the allegations in this case.

### A. DeFelice is an Accomplished Marksman as Recognized by an Authoritative Shooting Body.

Mr. DeFelice is a member of the International Defensive Pistol Association (IDPA). *Exhibit A* (affidavit); B (Shooting competition records). According to its website:

> The International Defensive Pistol Association (IDPA) is the governing body of a shooting sport that simulates self-defense scenarios and real life encounters. It was founded in 1996 as a response to the desires of shooters worldwide. The organization now boasts membership of more than 25,000, including members in 70 foreign countries.

IDPA, "*Our Story*," available at https://www.idpa.com/about-idpa/our-story/ (accessed 10/16/2023). He became a member on March 25, 2018. In order to compete in IDPA tournaments, an individual must enter according to a skill level classification. Mr. DeFelice qualified as an expert, the highest ranking in IDPA. *Exhibits* A & B. Part of attaining this level of skill was identifying the firearm that was most suited to him. Hence, he was required to cycle through multiple guns, until he found one that was best suited to the competitive conditions in which he used it.

### B. DeFelice Accepts as True, the Balance of the Government's Allegations for the Purposes of this Motion.

The government has accused Mr. DeFelice of manufacturing firearms without a license (Count 1) and possessing two short-barreled rifle and a silencer (Count 2). A search warrant affidavit and the ATF report that set out the investigation into Mr. DeFelice is included as *Sealed Exhibits* C and D. The allegations are summarized in this section.

Count 1 and the supporting discovery accuses Mr. DeFelice of building a Dark Storm Industries, model DS-15, multi-caliber firearm for a set of undercover taskforce officers for the ATF. Mr. DeFelice had a business card that he distributed to people in the gun community and advertised his services on Facebook. *Sealed Exhibit* C, at 4-5. The undercovers approached him in December of 2021 and arranged the purchase of the aforementioned firearm for $2,500. During that time, Mr.

DeFelice gave them a tour of his home and workshop where he worked on his numerous guns. Investigators noted that DeFelice had a valid Connecticut pistol permit with 173 transfers on it between May 2013 and May 2021.  *Sealed Exhibit* C, ¶ 12.

Based on the representations of the task force officers, the ATF obtained a search warrant for DeFelice's home.  There they found numerous firearms, parts, and gunsmithing equipment.  DeFelice received a target letter that Spring.  In July of 2023, he was indicted.  Count 2 alleged that he possessed two short-barreled rifles and a silencer that were subject to National Firearms Act taxation and registration.

Contemporaneous with this filing, Mr. DeFelice has moved for a bill or particulars as to several of the allegation against him.  First, he has requested clarification as to the alleged acts that constitute manufacturing.  There is a suggestion in the discovery that he performed cerakoting. Cerakoting is a process by which a ceramic coating is applied to firearms that (1) protects them from dirt and debris; and (2) alters there aesthetic appeal.  ATF regulations state that cerakoting is manufacturing, but it is unclear whether the government relies on this theory or whether the alleged assembly of the Dark Storm Industries firearm is the alleged crime.  Similarly, the ATF has recently taken the position that adding a receiver onto a pistol now makes it a short-barreled rifle.  Mr. DeFelice also seeks clarification as to this point because it raises legal issues about the ATF's rulemaking authority.

## II.     LAW AND ARGUMENT

That NFA requires payment of a tax as a precondition to the exercise of a fundamental constitutional right.  This scheme of taxation imposes a burden so severe that it is tantamount to a total ban on that right in many circumstances.  It bears a material resemblance to the taxation scheme that the Supreme Court held unconstitutional in *Murdock v. Pennsylvania*, 319 U.S. 105 (1943).  In

*Murdoch*, the Court held that a municipality could not require religious solicitors, Jehovah's Witnesses, to pay a fee prior to the distribution of religious literature: it was a quintessential First Amendment protected activity for which a licensing fee could not be a precondition.  This is no different but for the amendment and right at issue.

This, most certainly, cannot be what the founding era understanding of the Second Amendment entailed.  This scheme violates the Second Amendment to the Constitution because it burdens the right to keep and bear arms; it is not consistent with the history and tradition of firearm regulation in the United States, as required by the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022).  As this Court is well aware, *Bruen* is a revolutionary change in how courts must analyze the Second Amendment.  It mandates an inquiry into whether any gun regulation "is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition, may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).  The Revolutionary and Founding eras were famously ones animated by umbrage towards tax stamps—be they for tea, paper, or other commodities of the colonial system.  Moreover, where the Revolution begin in defense of the weapons cache at Lexington and Concord, it is inconceivable that the Founders would have authorized such a system of taxation and registration.

The Second Amendment guarantees, "A well-regulated Militia, necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."  U.S. Const. amend. II.  As the Court is aware, before the Supreme Court's recent decision in *Bruen*, lower courts developed a means-end test for evaluating firearm regulations based on *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

In *Bruen*, the Court wholeheartedly rejected the Courts of Appeals' means-end scrutiny. *Bruen*, 142 S. Ct. at 2131. Instead, the Court held, "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.*

In *Marcavage v. City of New York*, 918 F. Supp. 2d 266 (S.D.N.Y. 2013), a Court in New York held that a fee for the use of sound amplification devices in public places was not unconstitutional, as the fee was tailored to an important government interest. The Supreme Court in *Bruen* expressly contemplated regulations that may permissibly include fee payments, so long as the fees were not so "exorbitant [so as to] deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9. In *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose,* No. 22-CV-00501-BLF, 2023 WL 4552284, at *8 (N.D. Cal. July 13, 2023) (on appeal, July 14, 2023), a district Court found that a $25 fee for a gun license was not unconstitutional, but here the $200 per sale fee is eight times higher than in San Jose. Moreover, in *Marcavage*, the Court noted that *Murdock* had "differentiated between "the Court specifically distinguished between the type of nominal regulatory fee at issue in this case, which is permissible, and the unconstitutional prohibitive flat tax at issue in *Murdock;*" the flat fee here is clearly more analogous to the *Murdock* example than the *Marcavage* fee. In any case, that case predated *Bruen*.

The *Bruen* test first examines whether the "Second Amendment's plain text covers" the conduct proscribed by the challenged regulation. *Id.* at 2126. If it does, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).

*Bruen* makes clear that the <u>government</u> must <u>affirmatively</u> establish that a firearms regulation is consistent with this text and history of the Second Amendment for such regulation to pass constitutional muster.  The "Government bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen* at 2127; *see also Range*, 69 F.4th at 101; *Rahimi*, 61 F.4th at 450.  "Historical tradition can be established by analogical reasoning, which 'requires only that the government identify a well-established and representative historical analogue, not a historical twin.'"  *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2133).  "To be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue.  *Id.* (quoting *Bruen*, 142 S. Ct. at 2131).  "*Bruen* offers two metrics that make historical and modern firearms regulations similar enough:  'how and why the regulations burden a law-abiding citizen's right to armed self-defense.'"  *Id.* (quoting *Bruen*, 142 S. Ct. at 2133).  Where the government fails to make the appropriate historical showing, the defense need not offer any countervailing evidence for the Court to dismiss the case.  *See Bullock*, 2023 WL 4232309 at *31.  This framework must guide the Court's analysis.

    A.    **The National Firearms Act: A 20th Century Approach to Early 20th Century Crime.**

The NFA was originally passed in 1934 in response to violent organized crime arising from the Prohibition Era.  *See e.g.* A. Brad Schwartz, "*How The St. Valentine's Day Massacre Changed Gun Law*," N.Y. Times, Feb. 16, 2018 available at https://www.nytimes.com/2018/02/16/opinion/how-the-st-valentines-day-massacre-changed-gun-laws.html (accessed 10/16/2023); *United States v. Gonzales*, 2011 U.S.Dist.LEXIS 127121, 10-16, n.3 (Ut.D.Ct., 2011); *Guedes v. Bureau of Alcohol*, 66 F.4th 1019, 1020 (D.C. Cir., 2023) *Wilkins, J.* concurring.  One Court has, representatively observed:

7

During the Great Depression, the nation faced the difficulty of controlling violence by gangsters. *See* 78 Cong. Rec. 11,400 (1934) (statement of Rep. Robert L. Doughton) ("For some time this country has been at the mercy of the gangsters, racketeers, and professional criminals."); Nat'l Firearms Act Hearings, 73d Cong. 4 (1934) (Statement of Homer. S. Cummings, Att'y Gen. of the United States) ("[T]here are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined"); *Lomont v. O'Neill,* 285 F.3d 9, 350 U.S. App. D.C. 357 (D.C. Cir. 2002) ("The emergence of organized crime as a major national problem led to the enactment of the National Firearms Act of 1934."). Congress responded with a collection of legislation, including the National Firearms Act, targeting "the roaming groups of predatory criminals who know . . . they are safer if they pass quickly across a state line." Nat'l Firearms Act Hearings, 73d Cong. 4 (1934) (Statement of Homer. S. Cummings, Att'y Gen. of the United States). In enacting the National Firearms Act, Congress "sought to regulate the sale, transfer, and license of machine guns, sawed-off shotguns, sawed-off rifles,[1] and other firearms, other than pistols and revolvers, which may be concealed on the persons, and silencers." H.R. Rep. No. 75-2457, at 1 (1938).

The 1934 Act was originally drafted to include all pistols and revolvers, as well as short-barreled shotguns, short-barreled rifles, and machine guns. H. R. 9066, 73d Cong. (1934) ("[F]or the purposes of this act the term 'firearm' means a pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun."). In considering the Bill, the House Ways and Means Committee heard testimony from various groups, including gun manufacturers, the National Rifle Association ("NRA"), the American Legion, and the American Game Association. In addition, Congressional members received letters and telegrams from groups around the country, expressing various views about the proposed legislation. *See* 78 Cong. Rec. 11,398 (1934). Many of these comments, as well as much of the testimony, centered on legitimate uses for pistols and revolvers, and urged Congress not to require

---

[1] In the event the rationale behind regulating short-barreled rifles is a mystery, as it was to counsel, the Justice Department states that "Since the 1930s, the NFA has imposed requirements on short-barreled rifles because they are more easily concealable than long-barreled rifles but have more destructive power than traditional handguns." Department of Justice "*Justice Department Announces New Rule To Address Stabilizing Braces, Accessories Used to Convert Pistols into Short Barreled Rifles*" Jan. 13, 2023 available at https://www.justice.gov/opa/pr/justice-department-announces-new-rule-address-stabilizing-braces-accessories-used-convert#:~:text=Since%20the%201930s%2C%20the%20NFA,destructive%20power%20than%20traditional%20handguns. (accessed 10/16/2023).

>taxation and registration of such guns. Before passing the bill into law, Congress amended its language to include only short-barreled shotguns, short-barreled rifles, machine guns, and silencers in the definition of "firearm."

*Gonzales*, supra, at 10-14. While is abundantly clear that the Act considered silencers and short-barreled rifles to be regulated items, it is similarly clear that that judgment was made during a debate in 1934, approximately 140 years removed from the 1791 Founding Period.

### B. The Supreme Court Intervenes on Constitutional Grounds.

The Supreme Court largely nullified the NFA in 1968. In *Haynes v. United States*, 390 U.S. 85 (1968), the Court held that 26 U.S.C. § 5841 was unconstitutional on the grounds that it violated the Fifth Amendment's prohibition against self-incrimination. The Act, as then written, required a person who possessed an NFA firearm to register it; but the possession already being illegal, registration was tantamount to confessing a crime.

Later that year, Congress amended the Act in response to *Haynes*. This is referred to as the National Firearms Act of 1968. *See United States v. Early*, 482 F.2d 53, 59 (10th Cir., 1973). The *Haynes* court found the act unconstitutional:

>Because [the 1934 Act] required registration almost exclusively by those in illegal possession of a weapon and made this information available for prosecution purposes. The 1968 amendments avoided the problem by extending the registration to all possessors of the weapons, legitimate or otherwise, and 'by providing that registration information may not be used directly or indirectly to prosecute a natural person for an offense prior to or concurrent with his registration.'

*Id*. at 59.

Importantly, the 90th Congress reaffirmed the limited purpose of the NFA when it promulgated amendments in response to *Haynes*.

>The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title to place any undue or

> unnecessary Federal restrictions or burdens on the law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage of eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provided the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title.

*Gun Control Act of 1968*, 82 Stat. 1213, P.L.90-618.  Importantly, courts reviewing the 1934 Act have uniformly noted that it was directed at preventing the 'mob violence' that characterized much of the 1920s and 1930s.  *Gonzales*, supra, 2011 U.S.Dist.LEXIS 127121, 11 n.3 ("While the court is cognizant of the need to be wary of ascribing a single purpose to any action undertaken by the legislature, the discussion surrounding the 1934 Act evinced a widely shared concern for preventing mobster violence"); *McKee & Co. v. First Nat. Bank of San Diego*, 265 F. Supp. 1 (C.D.Cal., 1967)("When Congress passed the [NFA in June of 1934], imposing a tax on dealers in firearms and on the traffic of firearms, the purpose and intent of Congress was without question directed to the Dillingers, Ma Barkers, and gangsters who were plaguing the country with crimes of violence.."); *United States v. Adams*, 11 F. Supp. 216, 218 (C.D.Fla., 1935)("The [NFA arose from] a motive to prevent rackateers, bank robbers, and desperadoes from obtaining sawed-off shotguns and machine guns to run wild in crime and enable the government to trave ownership.").

   **C.**  **Pre-*Bruen* Caselaw has Already Determined that the NFA Operates as a Tax.**

Arguments such as the ones raised here have been raised and rejected in the past.  Critically, however, those arguments were considered before the Supreme Court's holding in *Bruen*.  Accordingly, those Court of Appeals holding are less tenable in light of *Bruen*

> The National Firearms Act, and the criminal penalty for violating it, are grounded in Congress' power to tax. See *United States v. Spoerke*, 568 F.3d 1236, 1245 (11th Cir. 2009). The Act creates a comprehensive taxation and registration scheme for certain statutorily defined "firearm[s]," which include

10

> silencers. See 26 U.S.C. § 5845(a). One part of the Act requires that any person who transfers a firearm to someone else must pay a $200 transfer tax and must register the firearm to the transferee. See 26 U.S.C. §§ 5811(a), 5841.3 It is the transferor, not the transferee, who is obligated to pay the tax and to register the firearm. See id. §§ 5811(b), 5841(b).

*United States v. Bolatete*, 977 F.3d 1022, 1031 (11th Cir., 2020).

### D. The Government Cannot Establish a Founding Era Analogue to the Present Regulatory Scheme.

The government cannot identify a Founding era analogue for any of the NFA provisions applied against Mr. DeFelice. He addresses each Count and theory in turn.

#### 1. The Government Cannot Identity a Founding Era Analogue to Manufacturing Firearms Without a License.

The allegations set forth in the indictment and the government's indictment, and the fair inferences arising from those sources, suggest that Mr. DeFelice was operating as a boutique maker of bespoke firearms. Not only is this consistent the Nation's tradition of small-time gunsmithing and craft, it is consistent with a Connecticut tradition that dates back to nearly the founding. Famously, Eli Whitney received a contract from the federal government to produce 10,000 muskets and bayonets in 1798 just north of New Haven at the New Haven Hamden town line. *See* Eli Whitney Museum, "*Arms Production at the Whitney Armory*," available at https://www.eliwhitney.org/museum/eli-whitney/arms-production (accessed 10/17/2023). Moreover, much of Connecticut is referred to as "Gun Valley" in a tradition of arms manufacturing that predates the Civil War. This historical field of production extends from the Whitney Armory in New Haven to the Springfield Armory in Massachusetts which was originally begun under the authority of George Washington during the Revolutionary war and began military production in 1794. National Parks Foundations, "*Springfield Armory National Historic Site*," available at https://www.nationalparks.org/explore/parks/springfield-armory-national-historic-site (accessed

10/17/2023). Samuel Colt established his first factory in Hartford in 1848 to mass manufacture his revolvers, moving the industry from artisanal workshops to a pattern of interchangeable parts and highly organized production, doing for firearms what Henry Ford would later do for vehicles.

### 2. The Government Cannot Identity a Founding Era Analogue Justifying Regulation of Short-Barreled Rifles.

The government cannot point to a Founding era analogue of regulations related to short-barreled rifles. Instead, the government is likely to point to various lower court decisions claiming that short-barreled rifles fall outside of the Second Amendment's protection. *See e.g. United States v. Saleem*, _ F. Supp.3d _, 2023 WL 2334417 (W.D.N.C., 2023); *Miller v. Garland*, _ F. Supp.3d _ (2023). But this is not consistent with *Bruen* for two reasons. First, it is impossible to construe whether items were historically protected by the Second Amendment because their possession and use has been so eclipsed by the NFA for the past 90 years. This sets an artificial time horizon on the historical question. Second, many of these cases still rely on *Heller* and fail to account for post-*Bruen* developments. *See e.g. United States v. Royce*, 2023 WL 2163677 (D.ND., 3/22/2023).

### 3. The Government Cannot Identity a Founding Era Analogue Justifying Regulation of Silencers.

The government cannot point to a Founding era analogue of regulations related to short-barreled rifles. The same rationale as explained in the previous section applies in this case.

### E. The NFA is a Tax Predicate to Exercise or a Fundamental Right that is Untethered from any Cognizable Safety Interest in Firearms Regulation.

The NFA represents a tax scheme that is a predicate to the exercise of a fundamental constitutional right. Precedent describes no clear historical analogue for regulations of silencers and short-barreled rifles, nor for the home manufacture of firearms. Moreover, the $200 tax stamp has

the power to completely eviscerate the right to bear these arms for many people. Several factors indicate that this scheme runs afoul of the Second Amendment.

First, it is well recognized that the NFA of 1934 represented "the first major federal attempt to regulate firearms…" *Guedes*, supra, 66 F.4th at 1020 *Wilkins, J.*, concurring. For 90 years, it has outlawed the types of weapons at issue here. However, it is a problematic tautology to suggest that these items are not in general use, and therefore outside the ambit of the Second Amendment, because the very law at issue has limited their use. Accordingly, this artificially created historical time horizon must be excised from the analysis.

Second, it is clear that the NFA acts as a tax structure that deters the possession of these arms by making them prohibitively expensive. This is an important fact for several reasons. Were these weapons so dangerous that they had no place in a society of ordered liberty, it seems that Congress would use its powers over interstate commerce, as it has with drugs, to simply outlaw these weapons on danger grounds.[2] Instead, it has created a system where only the wealthy can afford them. To the extent there is not a total prohibition on danger grounds, as there is with narcotics for example, it suggests that Congress recognized these arms are part of the Second Amendment—otherwise why permit them at all? Part of the answer to that question is that, clearly in the 1930s, there was some expectation that they would be enforced against only the John Dillingers and Al Capones of the world. *See Gonzales*, supra, n.3. But in the era of objective enforcement of statutes absent any acts of prosecutorial discretion, *see e.g. Whren v. United States*, 517 U.S. 806 (1996), target shooters and

---

[2] Notably, Congress did flatly prohibit machine guns in the Firearm Owners Protection Act of 1986 Pub.L.No. 99-308, § 102, 100 Stat. 449 (1986). *See Guedes*, supra, 66 F.4th at 1020; 18 U.S.C. § 922(o).

13

craftsmen like DeFelice—who has no criminal record—get swept up in modern day dragnets. This would be anathema to the 17th Congress as much as the NFA would be to the 1st Congress of 1791.

Third, the NFA does impose a tax that is tantamount to a total deprivation for many people. Importantly, the $200 fee for an NFA tax stamp was set in 1934, yet it was never pegged to inflation. According to an inflation calculator at Nerdwallet.com, $200 in 1934 was the equivalent of $4,368.66 in 2022; or according to the Federal Reserve Bank of Minneapolis's calculator, $4,373.53. In 1968, the $200 tax stamp would have been worth $1,682 according to both calculators. As a point of reference, the guns that Mr. DeFelice is accused of manufacturing and selling, he sold for approximately $2500. In a year-to-year comparison, this is a nearly174% mark up in 1934 dollars; or a 67% markup in 1968 dollars. A quick google search indicates that the M4 Carbine referenced in Count 2(b) of the indictment is currently on sale for $1,099.99 at Cabelas; thus a tax stamp for an NFA version of the gun would be a nearly 20% markup.

Several things are clear from these facts. First, the NFA was plainly designed to destroy the ability to possess NFA firearms by way of the taxation power, rather than simply outlaw them. This would seem to be a circumvention of the Second Amendment akin to the violation of the First identified in *Murdock v. Pennsylvania*. Second, the fatal conceit of this half-in-half-out approach is that it creates an environment where only the wealthy may possess these items; this is patently inconsistent with the allocation of our constitutional rights. Moreover, it undermines the claim that there is a compelling safety issue at play where items are made prohibitively expensive rather than flat out banned for the obvious danger they present. Finally, where Congress has not set out to adjust the tax stamp value in nearly a century, and inflation is up 2,100% since 1934, it is difficult to see what compelling safety interest is furthered such that it places these devices outside of the Second Amendment.

### III. CONCLUSION.

Over two centuries ago, Chief Justice John Marshall recognized that the power to tax is the power to destroy. Far from being a John Dillinger, Nicholas DeFelice is an accomplished marksman and craftsman who was unable to pay the government's taxes on his Second Amendment activities. Whatever the prudence of those decisions, he is now threatened with a federal felony and prison time after leading a law-abiding life in rural Connecticut. This is precisely the type of individual and conduct who warrants protection from government overreach, and that protection is warranted by law. The government will not be able to point to a historical analogue that justifies the possession of silencers and short-barreled rifles for the wealthy, but not for the working class. Accordingly, this indictment should be dismissed.

Respectfully Submitted,

*/s/Daniel M. Erwin/s/*
By Daniel M. Erwin (ct28947)
FEDERAL DEFENDER'S OFFICE
265 Church Street; Suite 702
New Haven, CT 06510
Tel: (860) 493-6260
Email: Daniel_Erwin@fd.org

CERTIFICATION OF SERVICE

This is to certify that on June 19, 2023, a copy of the forgoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the government has been provided with a copy of the forgoing.

*/s/Daniel M. Erwin/s/*
Daniel M. Erwin

16