UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.                                                  CRIMINAL NO. 3:23-CR-116(OAW)

NICHOLAS DEFELICE                                    December 1, 2023

**DEFENDANT'S REPLY TO GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Mr. DeFelice, through counsel, offers the following response to certain arguments made by the government in its opposition to his motion to dismiss.

The government's opposition is based primarily on the argument that "DeFelice's motion fails at step one: the plain text of the Second Amendment does not cover the manufacture or sale of firearms. … But even if the Court proceeds to the second step of the analysis, it must still find the challenged statutes constitutional because they are consistent with historical firearm regulation in this country." This is not correct. Several courts have suggested that the Second Amendment does protect commerce in firearms, whether as a right of the people in engaging in such commerce or as an assertion of the rights of their customers to own or use firearms. Moreover, the examples of firearms commerce regulation cited by the government as precedents for the National Firearms Act at issue in this case are not on point and have little or no precedential value.

I.   THE ALLEGATIONS ARE WITHIN THE SCOPE OF THE SECOND AMENDMENT.

The acts for which Mr. DeFelice is charged are in fact within the plain language of the Second Amendment. Indeed, the inclusion of manufacturing and sale of firearms under the Second Amendment is necessary: having the right to own something, but no one having the right to make or sell it, would be meaningless.

Along those lines, courts in the Seventh Circuit has held that:

> Although the City argues that "state bans of the sale of even popular and common arms stretch back nearly 200 years," Defs.' Br. at 24, the only historical support that it musters are three statutes from Georgia, Tennessee, and South Carolina banning the sale, manufacture, and transfer of firearms within their borders. See R. 158, Defs.' App. at A109, Georgia Act of Dec. 25, 1837, ch. 367, § I; Defs.' App. at A112–13, Tennessee Act of Mar. 17, 1879, ch. 96, § 1; Defs.' App. at A115, South Carolina Act of Feb. 20, 1901, ch. 435, § 1. But these isolated statutes were enacted 50 to 110 years after 1791, which is "the critical year for determining the amendment's historical meaning." Moore, 702 F.3d at 935. These statutes are thus not very compelling historical evidence for how the Second Amendment was historically understood. And citation to a few isolated statutes—even to those from the appropriate time period—"fall[ ] far short" of establishing that gun sales and transfers were historically unprotected by the Second Amendment. *Ezell*, 651 F.3d at 706. The City's proffered historical evidence fails to establish that governments banned gun sales and transfers at the time of the Second Amendment's enactment, so the Court must move on to the second step of the inquiry.

*Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 937 (N.D. Ill. 2014). See also *Kole v. Vill*. of Norridge, 941 F. Supp. 2d 933, 945 (N.D. Ill. 2013) ("even if the Second Amendment does not protect the sale of firearms directly, Plaintiffs can still pursue a claim that the Agreement and Revised Ordinance infringe their customers' personal right to keep and bear arms.") (Norridge had banned gun stores, and Kole sued to allow him to open one. The ban was later rescinded and Kole dropped his plans. See *Kole v. Vill. of Norridge*, No. 11 C 3871, 2017 WL 5128989 (N.D. Ill. Nov. 6, 2017).)  Moreover, these statements precede *Bruen*.

Similarly, there is a powerful analogy in *Luis v. United States*. The Supreme Court held that pretrial restraint of a defendant's legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment. In a concurrence, Justice Thomas noted that:

> Constitutional rights thus implicitly protect those closely related acts necessary to their exercise. "There comes a point ... at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." *Hill v. Colorado*, 530 U.S. 703, 745, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (Scalia, J., dissenting). The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (C.A.9 2014) (internal quotation marks omitted), and "to acquire and maintain

proficiency in their use," *Ezell v. Chicago*, 651 F.3d 684, 704 (C.A.7 2011). See *District of Columbia v. Heller*, 554 U.S. 570, 617–618, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (citing T. Cooley, General Principles of Constitutional Law 271 (2d ed. 1891) (discussing the implicit right to train with weapons)); *United States v. Miller*, 307 U.S. 174, 180, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (citing 1 H. Osgood, The American Colonies in the 17th Century 499 (1904) (discussing the implicit right to possess ammunition)); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (discussing both rights). *Without protection for these closely related rights, the Second Amendment would be toothless*.

*Luis v. United States*, 578 U.S. 5, 26–27, 136 S. Ct. 1083, 1097–98, 194 L. Ed. 2d 256 (2016) (Thomas, J., concurring in the result) (emphasis added.) Justice Thomas was taking issue with the majority's use of a balancing test to determine whether restrictions on Sixth Amendment rights allowed freezing of a defendant's assets; he instead based his conclusion "strictly on the Sixth Amendment's text and common-law backdrop," prefiguring the result in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 2132, 213 L. Ed. 2d 387 (2022), which he would author six years after *Luis*; *but see Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) ("the Second Amendment does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms. Commerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense, but the right of gun users to acquire firearms legally is not coextensive with the right of a particular proprietor to sell them.") One recent law review article discusses the centrality of limits on firearms manufacture and commerce to the Founders' concerns over gun rights, e.g., David B. Kopel, "Does the Second Amendment Protect Firearms Commerce?," 127 HARV. L. REV. F. 230 (2014) (Commentary):

> In terms of the original meaning of the Second Amendment, the right to engage in firearms commerce is clear.  It is one of the most important reasons why America's political dispute with Great Britain turned into an armed revolution.
> In the fall of 1774, King George III embargoed all imports of firearms and ammunition into the thirteen colonies.  The Americans treated the embargo on firearms commerce as evidence of plain intent to enslave America, and the Americans redoubled their efforts to engage in firearms commerce."

3

Moreover, one British official, envisioning what the colonies would look like once the Revolution were suppressed, posited a need to ban making or selling guns at all:

> "nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence."

Id. The manufacture of arms was an essential colonial era interest.

## II. THE GOVERNMENT HAS NOT CITED AN APPROPRIATE HISTORICAL PARALLEL.

The Government seeks to reinforce its arguments by stating that "even if the Court proceeds to the second step of the analysis, it must still find the challenged statutes constitutional because they are consistent with historical firearm regulation in this country." Gov. Memo at 2.

*Heller* in dicta said that among the types of restrictions on firearms ownership that were not to be understood as undermined by *Heller* were "longstanding prohibitions on the possession of firearms by felons and the mentally ill [and] …laws imposing conditions and qualifications on the commercial sale of arms." *D.C. v. Heller*, 554 U.S. 570, 626–27, 128 S. Ct. 2783, 2817, 171 L. Ed. 2d 637 (2008). Logically, such laws were clearly seen as restrictions of Second Amendment rights, albeit ones that were justified under the then-current balancing test. However, that dicta must now be viewed in the light of *Bruen's* reordering of the way courts must analyze Second Amendment rights, to include an inquiry into whether proposed restrictions are compatible with the historical record.

The government attempts to take that next necessary step by citing multiple colonial-era statutes related to commerce in firearms, but the cases are neither as clear nor as persuasive as the government asserts. Many relate to the broader prohibition on transferring arms to Native Americans or others deemed unreliable, a race- or faith-based regulation that is incompatible with modern understanding of Equal Protection. For example, the government cites a ban on selling arms to anyone

4

who was not a "loyal subject[]"; similarly the Massachusetts statute banning export of gunpowder was prefaced by concerns about arms and powder reaching Native tribes. Others, such as the cited Maine statute requiring gun barrels to be "proofed," are clearly safety or consumer protection laws, not restrictions on firearms per se. That statute requires a manufacturer to pay twenty-five cents for the work of the proofer, plus "the expense of the powder necessary for that purpose" (i.e. test firing the barrel to see if it would explode). Laws of the State of Maine 546 (1830). The reference to the ban on gunpowder exports in the Public Records of the Colony of Connecticut, v.15, is from a section that also requires the construction of new gunpowder mills; it is thus a statute *promoting the production and availability of gunpowder*, not one regulating it as a means of controlling access to it by the citizens of the colony.

Contrast the concerns underlying those statutes with those of the National Firearms Act: "It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517, 112 S. Ct. 2102, 2109, 119 L. Ed. 2d 308 (1992). In other words, Congress sought to *minimize* access to those weapons. The statutes cited by the government were largely designed to *assure* access to weapons and gunpowder (by the right kind of people), and assure that weapons were safe to operate. As such, the government's examples are not reasonable historical analogues for the NFA. At a minimum the government has not given the Court enough historical context for those statutes to show analogy the NFA; the fact of regulation is not nearly so important as the intended impact of those regulations.

Similar logic applies to the government assertion that Count 2 should not be dismissed because "The plain text of the Second Amendment does not guarantee an unequivocal right to possess a short-

barrel rifle." Gov. Memo at 13. The plain text of *Bruen* did not address short-barreled rifles, so the Government instead relies on *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). However, *Miller* analyzed the relationship of short-barreled shotguns to the Second Amendment in light of the then-standard view that the Second Amendment was designed to secure the viability of local militias, not an individual right to bear arms; its logic can thus not be applied after *Heller* or *Bruen*. See *United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023). (Nor can the government's assertion that the Second Amendment applies only to "law abiding" citizens be relied on in the wake of *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (petition for cert. filed, No. 23-374, October 10, 2023), which held that Range, who was indisputably a convicted felon, was not barred from possessing firearms.

Furthermore, post-Bruen, the government's assertion that "possession of a short-barrel rifle is not grounded in this country's historical tradition" and that the argument that "the Second Amendment protects only the 'sorts of weapons' that were 'in common use at the time' and does not protect 'the carrying of dangerous and unusual weapons'" – "accords with the historical understanding of the scope of the right," Gov. Memo at 13, is unconvincing. The NFA was enacted in 1934 and amended in 1968. The fact that the existence of the NFA has made short-barreled rifles and silencers uncommon in those 90 years makes their argument a tautology. Simply because short-barreled rifles, silencers, and the manufacturing thereof, were heavily controlled pre-*Bruen*, does not make them constitutionally unprotected after *Bruen*.

Similarly, the fact that NFA did not try to ban long-barreled, breech-loading semi-automatic weapons, does not mean they are protected by the Second Amendment as having been "in common use" at the time of the founding. In fact the Seventh Circuit held earlier this month that they are not covered. See *Bevis v. City of Naperville*, Illinois, 85 F.4th 1175 (7th Cir. 2023) (Cert. petition filed,

November 29, 2023) ("Assault weapons" are more similar to military weapons than civilian tools, and thus do not fall within the Second Amendment's protections.) The dissent in *Bevis* notes that the NFA and other modern acts "do not provide insight into the public understanding of the Second Amendment right in 1791 (or in 1868). They are too far removed from the ratification of the Constitution (or of the Fourteenth Amendment) to qualify as historical analogues under *Bruen*." *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1179 (7th Cir. 2023) (Brennan, J., dissenting).

Finally, the notion that the NFA was crafted using *Bruen* standards is untenable. It was clearly a measure designed to limit access to certain weapons based on early 20th century moral and technological standards. The fact that it controls short-barreled rifles but no similar acts cover such weapons as assault rifles, which are rapidly becoming ubiquitous, is itself an indicator the federal legislation regulating firearms is a creature of public whims than any principled analysis of the ways of Colonial society is implausible.

### III.    CONCLUSION.

The government's opposition to the motion to dismiss suffers from the same fault as so many government arguments for why particular firearms bans or restrictions are still valid post-*Bruen*: a refusal to acknowledge the magnitude of *Bruen's* logic, or perhaps an attempt to put the genie back in the bottle. However, "[i]t is emphatically the province of the judicial department to say what the law is." *Rucho v. Common Cause*, _ U.S. _, 139 S.Ct. 2484, 2494 (2019) quoting *Marbury v. Madison*, 5 U.S. 137 (1803). The Supreme Court has said what the law now is. It logic and reasoning lead inexorably to the conclusions asserted here. The Court, respectfully, should dismiss the case.

Respectfully Submitted,

> */s/Daniel M. Erwin/s/*
> By Daniel M. Erwin (ct28947)
> FEDERAL DEFENDER'S OFFICE
> 265 Church Street; Suite 702
> New Haven, CT 06510
> Tel: (860) 493-6260
> Email: Daniel_Erwin@fd.org

<u>CERTIFICATION OF SERVICE</u>

This is to certify that on December 1, 2023, a copy of the forgoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the government has been provided with a copy of the forgoing.

> */s/Daniel M. Erwin/s/*
> Daniel M. Erwin