UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

              vs.                     CRIMINAL NO. 3:23-CR-116(MPS)

NICHOLAS DEFELICE              February 7, 2025

## <u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>

*Where the air smelled like snakes, we'd shoot with our pistols*
*But empty pop bottles was all we would kill*

John Prine, "*Paradise*," on John Prine (1971)

Nick escaped the violence of his childhood home by running to the woods, to shoot guns. He was given a gun at the age of six by his *second* abusive, alcoholic stepfather, John. The only time that John was not abusing Nick was when the two were target shooting or gun smithing. Nick had every incentive to keep John happy. Nick himself maintains he has never hunted, never killed an animal, and only target shot for sport—an eminently plausible statement given Nick's docile persona. But when Nick was 14, the family dog got sick. John took Nick and the dog to the woods and told Nick to dig a hole. Then he told him to put his dog in it.  When the Nick balked at this cold-blooded violence, John hit him and immediately shot the dog. Now, Nick only has one eye, the other being glass. It was represented to DCF and friends as paintball accident. In reality, he has a glass eye because he eye-socket was caved in by the heel of John's boot, when he blamed Nick for a lost chain saw. Nick was 12.

In the chaos, violence, and ugliness of Nick's childhood, there was one source of fun, safety, and beauty.  For Nick, it represented the one fun thing he was allowed to do as a child—in between the long bouts of menial labor he was required to do and the abuse he was forced to endure. Counsel believes it a fair inference that guns provided Nick a sense of safety from volatile and violent men.

He found guns provided a sense of self-worth in his talents as a craftsman and competitor and built a bulwark against the shame cast upon him as a child. Nick saw in the pearl handled revolver a sense of craft and aesthetic—a creative outlet for his pain.

But that is over now. Nick wishes that he simply had not been involved in guns—lawfully or unlawfully. The core lesson he has learned, and the source of his remorse, is that guns are dangerous. He has some gratitude that he learned this lesson through his arrest and not by a deadly accident. Although he had prided himself on his meticulousness with guns, both as a craftsman and a marksman, Nick remorsefully accepts that he was not equally meticulous about the law. Thus, he accepts he is no longer suited to possess guns. Moreover, he is finding emotional outlets and meeting his needs in ways not available to him as a child. He is an unbelievably devoted father and stepfather of six children. He takes great pride in building the family he did not have as a child. Recently, after discussions with counsel and the probation officer (at the presentence interview, there were no serious compliance issues on pretrial supervision), Mr. DeFelice found a therapist on his own and is quickly responding to treatment.

The defense files this memorandum in anticipation of the sentencing scheduled for February 21, 2024. Mr. DeFelice pled guilty to one count of Possession of an Unregistered National Firearms Act Firearm in violation of 26 U.S.C. § 5861(d). He has a Criminal History Category of I. The probation officer has calculated the offense level at 17, but the plea agreement permits Mr. DeFelice to argue it is as low as 15. He contends that a sentence of probation is warranted on account of (1) serious childhood abuse; (2) a policy difference from the guidelines pursuant to *Kimbrough v. United States*, 552 U.S. 85 (2007); and (3) prompt rehabilitation and the fact that this felony conviction will operate to permanently disarm Mr. DeFelice in the future.

2

## I.       HISTORY AND CIRCUMSTANCES.

Mr. DeFelice's childhood was a near continuous parade of neglect, abuse, and abandonment. The only respite was target shooting. The Presentence Report largely sets forth Nick's upbringing. Rather than recite it, the defense uses this section of the memorandum to amplify or elaborate on certain themes and events in Nick's life.

Born in Portsmouth, Virginia, across the Elizabeth River from the naval bases of Norfolk, Nick and his mom moved to Connecticut when he was very young. He spent most of his life in the Uncasville area near the Mashantucket Pequot reserve. The childhood he describes was very rural, and by extension, isolated. He described cutting stone and working in a quarry after school or on the weekends. He describes taking care of goats, chickens, and dogs on the family's property. In one instance, Nick was beaten severely when he was blamed for a chicken that was attacked by a dog.

Nick presents in a somewhat unusual fashion. He is unfailingly polite and friendly—always calling counsel "Mr. Erwin," even in informal settings. Though born in Virgina and raised in Connecticut, he has the rural New England accent of New Hampshire, Cape Cod, or Maine. He has a beard more common to the Civil War era than the one in which we live—a look he has embraced so much that he calls his nascent construction business "The Bearded Guy, LLC." *PSR*, ¶ 50. He is also deeply religious. To that end, he frequently wears t-shirts and sets his phone background to depictions of the crucifixion.

None of these things would be remarkable or meaningful in isolation. But the picture of Nick that emerges over time, as these idiosyncrasies accumulate, is of a person with a cultural or social dissonance from the time and place in which he lives. At the risk of being rude, which is not counsel's intent at all, one cannot shake the feeling that he is talking to a character from A Prairie Home Companion when talking to Nick, not a young man at the cusp of the Millennial and Gen-Z

generations. There are two hypotheses for this, neither mutually exclusive of the other. First, when Nick was 10, the pediatrician observed to his mother that he might be autistic. Rather than follow up on this, his mother became offended, argued with the doctor, and left the practice. Nick has lived two decades under the cloud of possibly being autistic, without knowing or receiving services. Alternatively, or more likely, additionally, some of these things could be adaptive responses from the trauma imposed upon Nick in a very isolated environment.

The consequences of Nick's demeanor are significant for a young child. Imagine Nick's life at home: his mother brought two angry, violent men into the home. This is bad enough for a child with ordinary social skills. But most of us understand how bullies work: a child who is unaware of the ways in which his demeanor is unusual is, charitably, more likely to cause frustration for an adult stepparent; and, less charitably, a target for an abusive older man. School would not be different. Now, Nick is polite and warm enough that his idiosyncrasies have a certain charm. But that is not how children work: there can be little doubt that a child like this is a magnet for bullying in school.

Unlike many people with similarly difficult backgrounds, Nick avoided trouble until this case. He became involved in high school wrestling. On the one hand, it was useful insofar as it instilled structure in a relatively healthy environment. On the other, it was largely pushed by his stepfather's penchant for violence and hyper masculinity.

Impressively, Nick ran for Montville's Republican Town Council at the age of 19. Jeffrey Johnson, "*Montville teen ends council bid to enlist*," Sept. 6, 2011, available at https://www.pressreader.com/usa/the-day/20110906/281706906395135?srsltid=AfmBOorI7gdYqoysfgdKwsq1B7RZzwc6BNvPK5aRpO

ycsThXDeRWhRjt.[1] After his age was questioned as qualification, he withdrew with plans to join the Army. An article from the time summarized an interview with Nick as saying, "DeFelice said he envisions himself in the Army as the man who would blow open doors with explosives. He said the Army could also provide the chance to continue wrestling in some capacity." *Id*. While his statement was, perhaps, a bit immature, his motives were clearly about serving his community and contributing to the world.

Nick became a father at the age of 20 and was a single father as his first relationship disintegrated. Caring for his first daughter alone, he had to rise to the challenge at a young age. He found his calling in that regard, insofar, as he is now a father of six between his biological children, stepchildren, and a college-aged, young man from Springfield, MA he and his wife adopted. He views himself as a committed family man, and his kids and family are now his life. Notably, there is no hint that Nick has ever perpetrated domestic violence. That stands in contrast to in the many cases with this many guns, trauma history, and young challenging relationships where there is such a history.  L. Geller, *et al*., *The role of domestic violence in fatal mass shootings in the United States, 2014-2019*, Injury Epidemiology 8:38 (2021).

But parenthood imposed upon Nick stresses for which he needed an outlet. In 2014, as his daughter became a toddler, Nick explains that she got very into the *Frozen* movie series that began in 2013. Thinking it would be good for them both to have a hobby, he returned to shooting guns after a separation from them as he aged out of his childhood home. He got his permit and entered a

---

[1] Notably, the article states that Nick is blind in one eye from a paint ball accident. This article was written 14 years ago. He has since explained that his parents told DCF he lost his eye in a paintball accident and instructed him to lie about it. Since, then Nick has revealed that he lost his eye as a result of abuse.

competitive shooting league. If it sounds immature for a father to find such a hobby in guns to parallel his two-year-old daughter's interest in *Frozen*, it is. However, Nick was introduced to guns at the age of six. Moreover, any parent knows that two is an age where child rearing goes from hard to vastly harder, and Nick was doing it by himself.  People with histories of trauma may fall back into familiar behaviors and patterns when they are triggered. Dr. Bessel van der Kolk, a renowned trauma researcher, described this tendency as follows: "High arousal causes people to engage in familiar behavior, regardless of the rewards. As novel stimuli are anxiety provoking, under stress, previously traumatized people tend return to familiar patterns, even if they cause pain." Bessel A. van der Kolk, MD, *The Compulsion to Repeat the Trauma,* Psychiatric Clinics of North America, Vol. 12, Issue 2, at 389-411, June 1989, available at https://www.cirp.org/library/psych/vanderkolk/.  As Nick navigated the challenges of fathering a baby girl in his very early twenties with no model parenting in his life, he returned to the one thing that was familiar, happy, and safe from his own childhood.

Nick became deeply involved in shooting and gunsmithing. He bought hundreds of guns, always looking for the perfect one for his competitive shooting. He resold many used handguns and completed the legally required state firearms transfer forms with the Connecticut State Police. He attained the second highest skill ranking in the league.[2] He developed expertise in gunsmithing and took pride in crafting guns as aesthetically pleasing objects. He began a business crafting custom-built firearms and trained people on firearms safety. Notably, Nick recalls that he discouraged people from relying on firearms for home defense because of the heightened chances of accidentally killing a loved one. He believed that it was more effective to disburse pepper spray in the hallway and wait

---

[2] This details of this and supporting exhibits are further set out in the October 2023 Motion to Dismiss.

for the police in the event of a home invasion than to introduce a gun or shoot through a door, especially given that the effects of pepper spray are reversible in the event of an error. While he has clearly erred here, there is other circumstantial evidence that Nick was not as constantly reckless as one might assume.

In 2020, another major challenge arose. Nick's wife Jessica gave birth to their now 5-year-old daughter (her full name is reflected in the *PSR*). She was born with a congenital heart condition called Schone's Complex. *See* Cleveland Clinic, "*Shone's Complex*," available at https://my.clevelandclinic.org/health/diseases/21643-shones-complex (last visited Feb. 7, 2025). It is a rare disease characterized by legions or holes on the left side of the heart that eject blood to the body. Nicks says she was expected to die when diagnosed shortly after birth. It required immediate surgery, followed by two months of hospitalization at Yale New Haven Hospital. While the surgery itself was covered by insurance, Nick and his wife were charged innumerable additional fees at the hospital, as well as insurance copays, and they had to buy numerous medical supplies out of pocket. *See, e.g.,* Elwin G. Schwartz, *Opinion: Yale New Haven Stop Extra Out Of Pocket Medical Fees*, CT Mirror (Oct. 23, 2023), available at https://ctmirror.org/2023/10/12/yale-new-haven-health-insurance-medical-fees/ (local physician of 40 years characterizing Yale New Haven's practice of charging separate "hospital facility fee" in addition to medical fees as deeply unethical). The drive from Uncasville to Yale New Haven is nearly an hour in each direction, which cut in to Nick's working time. He recalls having to buy a feeding tube for Ella and constantly struggling for time and money to care for his new daughter.

Nick sold his guns to make ends meet. He says, "my family is more important than my guns." Many were non-NFA hands guns that he sold legally through the state of Connecticut's transfer process (the government has shown counsel numerous transfer forms Nick filed). One thing he liked

7

about guns was that they more-or-less held value and that he could buy one, shoot it for a while, and resell it easily to try another. Obviously, not every transaction was legal.[3] But they were done in the face of compelling personal circumstances.

Indeed, it takes more than hobbies and financial security to manage the profound traumas inflicted upon Nick as a child. On the one hand, had Nick conformed his conduct to the contours of the NFA, he would not be here. But that is not really counsel's point in this paragraph. If Nick's hobby was building model trains, he also likely would not be here. But his mental health needs would be left untreated. This is a case in which a person can remedy his mental health and in turn directly address his illegal conduct, far and above what is necessary to live a law-abiding life.

Nick has started this journey in two ways. First, he is now married and in a committed and supportive relationship. Between he and his wife's shared children, Nick is a father of five. In addition to those five, he and his wife learned that a teenage boy, to whom they had a very distant family connection, was in trouble and without a safe home in Springfield, MA. Nick immediately brought him into their home and began raising him as their own. He refers to him as "his son" even though the two are just barely far apart in age to be an actual generation removed. The boy is doing well, and Nick is helping to get him to college. Nick has created a healthy and supportive family life unlike his own that is anchoring him against his personal demons.

_____

[3] For comparisons sake, the cost of an NFA tax stamp is $200. The Federal Employee Cross Blue Shield insurance program currently charges a copay of $250 per day for hospital care and surgical recovery. *See* BCBS, *FEP Blue Basic Benefits*, available at https://www.fepblue.org/our-plans/basic-chart. Upon information and belief, this copay amount was $200 circa 2020 to 2022 and has recently increased.

8

The second development is recent but promising. At the presentence interview, the probation office and counsel had a serious conversation with Nick about therapy. It seemed to be the first time someone had actually brought this to his attention in a meaningful way. One might assume Nick was the type of person reticent to go to therapy on the false premise that it was (1) inconsistent with a hyper-masculine personality, (2) too uncomfortable, or (3) not necessary because he was "fine" despite the clear evidence to the contrary. None of that was true. Nick's view was that there are so many people in the world who have it worse than him that he did not want to take valuable resources from them. Counsel and the probation officer told Nick that, while that was admirably selfless, he had been through things that could likely only be processed in a therapy. As a father of six children, his mental health was essential to their mental health. Within a week, Nick had found a therapist on his own. He describes it as a profoundly valuable experience and brings lessons of therapy to his conversations with counsel. Notably, while he did do this in response to the legal system, he executed his treatment plan completely on his own without the assistance of the Federal Defender's Office or Probation. That shows a commitment and openness to this process. And it is working.

## II.    SERIOUSNESS OF THE OFFENSE.

Undoubtedly, this offense implicates very serious public safety concerns. The defense acknowledges those concerns explicitly in the subsequent section of this memorandum, *infra*. While this memorandum addresses the cost of an NFA tax stamp, the defense also concedes that the government has an important interest in tracking the most dangerous firearms placed into the stream of commerce by gun makers, both large and small. There are important public policy interests furthered by the NFA: these are dangerous products placed into the stream of commerce, which the government has an interest in regulating and tracking.

9

The defense will note one area of ambiguity. Part of Mr. Defelice's relevant conduct is the Cerakoting of guns. This is a process in which a ceramic layer is applied to the gun, protecting against dirt and rust, and—as was the case in Mr. DeFelice's view—making the gun more aesthetically appealing. Counsel will admit that this public safety evil was not immediately evident to him. He looked high and low trying to find an answer and still struggles to find an authoritative one. In fact, at a meeting to review evidence with the government, he asked an ATF agent why a Cerakoted gun was more dangerous, and the agent did not know. The best answer has come from a fellow defense lawyer who says this process obscures the serial number, which is what counsel assumes at this point. He does not say this to minimize Mr. DeFelice's conduct, and indeed there are other ways in which it was illegal about which there is no ambiguity. But counsel would note that, where people could be incarcerated for an offense, we would ideally have complete knowledge of how it undermines the public interest.

There is no doubt, at least overall, about the serious public interests effected by this offense.

10

### III. THERE IS A SERIOUS POLICY DIFFERENCE THAT WARRANTS EXERCISE OF THE COURT'S AUTHORITY PURSUANT TO *UNITED STATES V. KIMBROUGH*, 552 U.S. 85 (2007).

> When the carnage was over you could hear the cellphone ringing
> You could smell gunpowder in the air
> And on the bloody ground, the LEDS were blinking
> Deliver us from evil, thoughts and prayers
> …
> When my children's eyes look at me and they ask me to explain
> It hurts me that I have to look away
> The powers that be are in for shame and comeuppance
> When Generation Lockdown has their day
> They'll throw the bums all out, and drain the swamp for real
> Perp walk them down the Capitol steps and show them how it feels
> Tramp the dirt down, Jesus, you can pray the rod they'll spare

Patterson Hood, Drive-By Truckers, "*Thoughts & Prayers*," on The Unraveling (2020)

Counsel will concede something right up front: the public statements of a former Supreme Court Justice are not precedent, much less binding on this Court. But conversely, there is little doubt that they do contour the, so called, "Overton Window" of reasonable, mainstream legal policy disagreements. In 1991, former Chief Justice Warren Burger was asked about the enduring value of the Bill of Rights on the MacNeil/Lehrer New Hours on PBS. While vouching for the Bill, generally, he noted areas for improvement: specifically, he would not have included the Second Amendment. He then, more specifically, read the text of the Amendment and said, "this has been the subject of one of the biggest pieces of fraud, I repeat the word fraud, on the American public, by special interest groups that I have ever seen in my lifetime." MacNeil/Leher New Hour (Dec. 16, 1991), available at https://www.youtube.com/watch?v=hKfQpGk7KKw (at 00:35-00:55). His comments were prescient but unheeded.

Five years later, Congress passed the Dickey Amendment prohibiting any federal funds from being used to explore gun violence as a public health epidemic. *See, e.g., Holcombe v. United States*,

11

516 F.Supp.3d 660, 682 n.4 (W.D. Tex. 2021) citing *Omnibus Consolidated Appropriations Act*, Pub.L.No. 104-208 (1996).  Three years later, 15 students were shot to death at Columbine High School in Littleton, Colorado. Five years later Congress permitted the Brady Bill, the 1994 law banning assault weapons to expire. Six years later, the 109th Congress passed the Protection of Lawful Commerce in Arms Act, in 2005. The purpose of the law is to protect firearms manufacturers from product liability claims following gun deaths. In 2007, a 23-year-old killed 32 people at Virginia Tech with guns purchased legally—2 years after a court ordered him to seek mental health treatment. *See, e.g.,* Associated Press/NBC News, *The 'unremarkable sale' of a gun to student killer*, NBC News (Apr. 18, 2007), available at https://www.nbcnews.com/id/wbna18170761. In 2011, Jared Loughner killed 6 people and injured 14 while trying to assassinate a Congresswomen in Arizona, with a Glock he bought legally after showing signs of severe mental illness. ABC News, *Glock 19: How did Unemployed Jared Loughner Buy Popular, Expensive Pistol* (Jan. 10, 2011), available at https://abcnews.go.com/Business/questions-remain-jared-loughner-paid-expensive-firearm/story?id=12585290. The following year, in this state, a 20-year-old used guns his mother bought legally and made available to him—mostly if not totally legally—to kill 26 people, most of whom were first graders, at an elementary school. It was one of 16 mass shootings that year with legally purchased guns*,* including one at a movie theater in Aurora, Colorado that killed 12 and wounded 59. In 2013, there was some belief that the murder of elementary school students might generate will to act. Not so. The Assault Weapons Ban of 2013 was defeated in the Senate 60-40; and the Mancin-Toomey Amendment was defeated as well. Ed O'Keefe & Philip Rucker, *Gun-control overhaul is defeated in Senate*, Wash. Post (Apr. 17, 2013), available at https://www.washingtonpost.com/politics/gun-control-overhaul-is-defeated-in-senate/2013/04/17/57eb028a-a77c-11e2-b029-8fb7e977ef71_ story.html. In 2015, a 21-year-old

white supremist killed 9 African American worshipers in a church with a gun he was sold, mostly legally, where the FBI background examiner neglected to obtain a police report. Larry Buchanan *et al*, *How They Got Their Guns*, N.Y. Times (Feb. 14, 2018), available at https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-guns.html.    In June of 2016, 49 people were killed and 53 wounded at a gay night club in Orlando: the guns were purchased legally. *Id*. In 2017, 58 concert goers were killed and 500 wounded by a man who legally purchased 33 firearms in the year prior. *Id*. The 2018 Parkland, Florida shooting that killed 17: guns bought legally. *Id*. This *non-exhaustive* paragraph lists 209 guns deaths and 626 casualties from legally purchased firearms between 2007 and 2018. For each bullet that passed through those children, students, teachers, music lovers, worshipers, public servants and unpaid exercisers of First Amendment rights, the 109th Congress has protected the profits of the gun manufacturers that made and sold the bullets and guns used to perpetrate these atrocities. Not once did Congress intervene.

Now, the government is using a 1934 law to address a 21st Century public health problem. And God bless it for trying: neither counsel nor Mr. DeFelice question the legitimacy of this prosecution. But it does so without the help of Congress. Indeed, the 117th Congress passed the Bipartisan Safer Communities Act of 2022, Pub. L. 117-159, after the elementary school shooting in Uvalde, Texas that killed 19 students and 2 teachers with, again, two legally purchased AR-15s. The Act also followed the shooting in Buffalo where a white supremacist killed 10 shoppers in a supermarket with guns that were legally obtained but illegally modified. The Act provides more resources for background checks; closes the "boyfriend exception" for domestic abusers as prohibited persons; funds state red flag laws; and—most noticeably to this Court—increased the statutory penalties for felons in possession from 10 years to 15. While that has changed plea colloquies, it seems unlikely it will change sentences or deter possession. Most notably, however, is that the law

neglected two issues: first, it did nothing to support or authorize a product liability theory of gun deterrence, nor amend the PLCA Act; second, it did nothing to raise the cost of a $200 NFA tax stamp—set in 1934—to adjust for the realities of inflation in the intervening 88 years. Shareholder value was protected, children were not. The argument remains "enforce existing gun laws," which the government is very legitimately doing here.

But consider a recent historical example of a wrong doer and the National Firearms Act (NFA). As the Court will likely recall, a gunman shot and killed 18 people and wounded 13 others in Lewiston, Maine on October 25, 2023. Notably, reporting has indicated that the gunman was *denied* the sale of an NFA silencer because he, honestly, answered on a Form 4473 that he had been hospitalized for mental health problems. Chelsia Rose Marcius, *Maine Gunman Disclosed He Had Mental Health Issues, Gun Shop Owner Says*, N.Y. Times (Oct. 9, 2023), available at https://www.nytimes.com/2023/10/29/us/maine-shooting-gunman.html. One might argue that, in a vacuum, this is a public policy success: the man was honest, and the law worked as intended. But then that same individual committed mass murder three months later with guns he had purchased legally. *Id.* ("Officials have said that [the gunmen] had legally purchased his weapons."). This is hardly the stuff of public policy success.

The best argument, then, is that strict enforcement of the NFA does incremental good insofar as it reduces victims in these heinous acts. Therefore, the logic would go, violations should be punished harshly to send a message to others doing paperwork associated with firearms transactions . While speculative,[4] it may be true, and counsel assumes it for the sake of argument. Indeed, if the

———————————————

[4] Given the Dickey Amendment's life, from 1994 to 2019, there may very well be serious gaps in any data.

absence of a silencer reduced the victim count in Lewiston by even one person, that is a good thing. Indeed, there may be parents who still have a child—or vice versa—because of the NFA and form 4473. That fact, if it is a fact, should be treated with respect. But that child—that family—still had to endure a mass shooting and return to a broken community. No sentient member of the public would call that a public policy success.

The defense offers none of this to legitimize or rationalize what Mr. DeFelice did. Counsel cannot put enough distance between his client and the characterization that "simply because corporate America does, Mr. DeFelice can too." Nor would he embrace the argument that because gun laws appear futile at deterring gun violence, Mr. DeFelice should escape liability. Each individual has a responsibility to follow the law and protect our neighbors from these horrendous events. This argument is deeply rooted in that premise: what Mr. DeFelice did put people in danger, and some punishment for that is appropriate.

The point is this: there are far more modest and incremental steps that Congress could take to curb gun violence. It could amend the PLCA Act to permit some type of civil vicarious liability for gun manufactures or dealers that legally, but coyly, market their products to insecure young men; or it could reframe the law so as not to preempt states from doing so. The Connecticut Supreme Court has recognized the negligent entrustment theory as a very limited, non-preempted theory of vicarious liability. *Soto v. Bushmaster Firearms, LLC*, 331 Conn. 53 (2019) cert. denied; *Remington Arms Co. v. Soto*, _ U.S. _, 140 S.Ct. 13 (2019). Congress did not touch it in the Bipartisan Safer Communities Act of 2022; presumably it was aware of the decision. On the one hand, this might support a theory of legislative acquiescence. *See, e.g., Cruz v. Abbott*, 849 F.3d 594, 600 (5th Cir. 2017) ("Although our precedent is not binding on Texas courts when interpreting Texas state, it is reasonable to assume that the legislature was aware of these decisions"). But that does not prove enough: why would the

15

117th Congress leave the product's liability theory to a patchwork of 50 states where the 109th preempted regulation? In light of a, compelling federal interest, would it not have set out a unified policy? Similarly, Congress could have connected the NFA tax stamp to inflation to make NFA firearms prohibitively expensive as it did in 1934 following the St. Valentines' Day massacre. It could have enacted national red-flag laws for the temporary disarmament of mentally ill people. It did none of those things.

Instead, it left the government, courts, and the public to live—or exist—between two extremes. On the one extreme are loosely regulated, but extremely profitable, companies who are permitted to go about their business regardless of how much devastation their products work in the hands of mentally ill consumers. Indeed, their profits are protected from each tragedy. On the other hand, is a criminal regulatory machine, nearly a century old, repurposed to fit a modern problem. This machine may incarcerate real flesh-and-blood people, through the deliberate violence of the government's monopoly on force, merely because a defendant "knew of the features of a [gun] that brought it within the scope of the [NFA]." This asymmetry in treatment for corporations and average people is a profound inequity that does nothing to further the public interest.

That is why this is a *Kimbrough* issue. As the Court will surely recall, *Kimbrough* was a case about the court's post-*Booker* sentencing authority, filtered through the 1:100 cocaine to crack sentencing ratio. 552 U.S. at 94-95. ("Although chemically similar, crack and powder cocaine are handled very differently for sentencing purposes. The 100-to-1 ratio yields sentences for crack offenses three to six times longer than those for powder offenses involving equal amounts of drugs…This disparity means that a major supplier of powder cocaine may receive a shorter sentence than a low-level dealer who buys powder from the supplier but then converts it to crack.") Though not a perfect, fact-to-fact analogy, it is sufficiently apt as to be informative. Essentially, people like

16

Mr. DeFelice are situated as crack dealers in this comparison, and those who negligently entrust firearms to mentally ill wrong-doers in a federal legal firearms sale are situated akin to cocaine users (in reality, far better). Suppose, hypothetically, two AR-15 transactions: one in which a licensed seller, sells an NFA firearm to a person who is an avatar for the Tucson or Virgina Tech shooters—young men with known mental illnesses—but buys an NFA tax stamp with the necessary paperwork; the other transaction is one in which the same gun is sold, for $200 cheaper, without an NFA tax stamp or registration. In both instances, the buyer does something terrible with the gun and kills others. One seller has committed a felony, the other has earned a tidy profit which the federal government protects from civil judgments. This would seem the textbook definition of absurd results.

The defense does not ask the Court to excuse Mr. DeFelice's conduct. It simply asks the Court to recognize that this is a set of circumstances ripe for scapegoating. Heinous murders occur on a routine basis: the culprits usually die at their own hands or at the hands of the police, whereas the merchants of death that supply them are shielded from liability by the 109th Congress, and the public has no one to hold to account. It is perilously easy to take out that valid anger on a young man like Mr. DeFelice. Rarely is the Aristotelian idea—that anger is easy, but expressing it at the right person, to the correct degree, at the right time, for the right purpose, the right way—more important.

It is important because it is the best way to serve the public interests at stake in this case. Mr. DeFelice is now disarmed: he is disarmed by way of his personal remorse and regret for picking up guns at all; and he is disarmed by operation of law as a convicted felon. He is punished insofar as his source of pride is now a source of shame. He is well on the path to rehabilitation. But to incarcerate him for any period remotely consistent with the guidelines is to give to the public the false promise that this epidemic is being addressed in a meaningful way. "There comes a point where we should not be ignorant as judges of what we know to be true as citizens." *United States v. Zubaydah*, 595

U.S. 195, 238 (2022), *Gorsuch, J.*, dissenting, quoting *Watts v. Indiana*, 338 U.S. 49, 52 (1949), *Frankfurter, J.* dissenting. The public has chosen these circumstances, and it is an appropriate use of this Court's *Kimbrough* authority to reflect that back.

Similarly, it is with the Court's power to consider the type of nuanced incrementalism that Congress will not. Perhaps in another world, civil controls on gun sales might have deterred Mr. DeFelice from getting a gun in the first place (instead of at the age of six). Perhaps in another world a "red flag law" might have not only disarmed him but connected him to mental health resources. That is not the world we live in. Instead, Mr. DeFelice is now a convicted felon. But that conviction alone is sufficient to accomplish public safety goals: it is disarming, shaming, and rehabilitative to the extent that mental health services are needed. Where many sectors of our society occupy extremes—that we must accept laisse-faire violence or reflexive incarceration—this Court is entitled to occupy a sober middle ground. It is warranted in this case.

The government does yeoman's work in this case. It is taking the antiquated and minimal tools available to it, to address a compelling public problem where every other institution is ignoring it. That is noble. But make no mistake: this is essentially a products liability case, enforced by criminal sanctions. Neither Congress nor a federal court has permitted a civil products liability theory, nor a red flag approach despite over 10,000 gun deaths per year, many with legally purchased firearms. One might call this a *res ipsa loquitor* situation. While Mr. DeFelice should not have done this, and absolutely should be deterred, he should not be the scapegoat for the many people and institutions who are derelict in these circumstances. Perhaps this case will make the public safer, but only at the margins. Legal guns will still be unscrupulously marketed to troubled young men. *See, e.g.,* M. McIntire, G. Thrush, & E. Lipton, *Gun Seller's Message to Americans: Man Up*, " N.Y. Times (June 18, 2022), available at https://www.nytimes.com/2022/06/18/us/firearm-gun-sales.html (noting

18

firearms marketing campaigns including Bushmaster's 2012 AR-15 campaign stating "consider your man card reissued" next to picture of rifle; and gun dealer slogan "be a man amongst men"). We can all agree that there are more than enough casualties associated with this issue: nuance and the broken young man before the Court need not be added to the count.

## IV.   ARGUMENT: A SETNENCE OF PROBATION IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACCOMPLISH THE PURPOSES OF SENTENCING.

A sentence of probation satisfies all of the interests identified in 18 U.S.C. § 3553(a)(2). First, felony convictions are a sufficient general and specific deterrents for this conduct and promote respect for the law. Second, probation would provide—and further access to—Mr. DeFelice's much needed medical care and treatment needs. *See* §3553(a)(2)(D) & (3). Finally, it would not create unwarranted sentencing disparities. Mr. DeFelice addresses each herein.

First, a sentence of probation would promote deterrence. Mr. DeFelice has been specifically deterred insofar as he had federal law enforcement entered his home and removed his firearms. Moreover, this prosecution stands for the proposition that the government will tell him or anyone—forcefully—that he is not suitable for lawful firearms possession should he fail to have that insight himself. Now, 18 U.S.C. § 922(g) clearly prohibits his possession of *any*, not just NFA, firearms. The Supreme Court has recognized that the mere fact of conviction is inherently punitive noting the "'societal stigma accompanying any criminal conviction.'" *Rutledge v. United States*, 517 U.S. 292, 302 (1996) quoting *Ball v. United States*, 395 U.S. 856, 864 (1980). This is particularly true in the context of gun cases because a person's second amendment privileges are part and parcel of the constitutional rights forfeited upon conviction. In addition to the customary prohibitions on firearms possession flowing from the court's supervisory authority, felons forever lose their firearms rights which is a deprivation of unique consequence to gun owners. Moreover, as a person who has formerly

run for office, Mr. DeFelice has likely forfeited this privilege of citizen for most, but perhaps not all, political offices. This is punitive and has deterrent value.

Additionally, federal probation holds the possibility of resentencing upon a violation. Were any later circumstances to develop to suggest Mr. DeFelice had not been deterred, the Court would have the power to reconsider its sentence. This too has deterrent value.

Second, a sentence of probation would not only provide Mr. DeFelice with needed treatment but oversee it in a way that protects any public safety concerns. Clearly, Mr. DeFelice will always be a child of deep trauma, but it is well known that the Probation Office can continue to connect him with resources tailored to his needs. Mr. DeFelice has had a near exemplary record during the pendency of this case, since he received a target letter in early 2023. Not only has he been working and seemingly stabilized his employment, he has entered treatment on his own volition and effort and is doing well. He anticipates that his daughter will need further surgeries in the future. Keeping him at liberty so that he can care for her and prepare for this next round of challenge is far more stabilizing, a bulwark against re-offense, makes far more sense than incarcerating him and forcing him to begin anew upon his eventual release. He should maintain this momentum.

Finally, a sentence of probation would avoid unwarranted sentencing disparities. Probationary sentences for this offense—or similar firearms possession offenses—are not uncommon in this district. *See United States v. Haneef Brooks*, 3:19-cr-226(VAB) (36 months' probation for felon in possession where defendant sold rifle for drug money and had 15–21-month guidelines range); *United States v. Dancer*, 3:20-cr-252(VAB) (36 months' probation for National Firearms Act offense (possession of silencer and conversion devices) with 6 firearms and ammunition; CHC II and 30 to 37 month guidelines range). The sentence Mr. DeFelice seeks is on par with similar sentences in this district. Notably, the defendant in the lead case on NFA firearms possession also received a sentence of

probation and a $5,000 fine, following a trial in *United States v. Staples*, 511 U.S 600 (1994). The *PSR*, ¶¶ 60-62, correctly recites the JSIN data for an offense level of 17 and CHC I. Notably, however, JSIN also indicates the 17% of defendants (144 of 849) received no incarceration in the absence of § 5K1.1 motions. Moreover, the mean sentence is 20 where the median is 24. Where the data "skews left," is suggested a substantial number of below guidelines sentences as well. Where this data is coupled with Mr. DeFelice's childhood circumstances, probation would create no unwarranted sentencing disparities.

A sentence of probation has ample support in §3553a and satisfies the parsimony clause.

## V.    CONCLUSION.

This is a case about paradoxes and contradictions. There are people in this country who genuinely find tranquility being in nature and shooting for recreation. Empty pop bottles are all that they kill. But this country is also exceptional in tolerating gun violence nearly so frequent a person could set his watch to it. Congress and the Supreme Court have left the government with vanishingly few legal resources to see that children are spared this type of violence in classrooms. One might think Congress could spit-shine the 1934 law the government relies upon in this case for the 21st Century. Instead, the government is left to go after largely tax based, regulatory violations, on an ad hoc basis. The defense readily concedes that this could save lives: it is a noble and legitimate goal and in no way intended to minimize what happened here. Simultaneously, lengthy prisons sentences for the exceedingly small number of people who run afoul of the NFA, where so much reckless gun business in this country is not only legal but affirmatively protected, gives the public a false illusion of safety.

Nick DeFelice was raised among profound physical violence. Along the way, a stepfather made the unusual parenting choice of introducing a six-year-old to a gun as his single act of fatherly love. The result of that decision had the effect of making guns for Nick what Teddy Bears are for most children. Nick may not be the unluckiest victim of what former Chief Justice Berger called a "fraud on the American people," but there is little doubt that he was inculcated in this deception at a very young age with no other outlet. He too is collateral damage. But where we see an appalling failure of family, wrapped in a shocking failure of social and political institutions, we also see a radical study in personal responsibility rising from layers of failure. Among the things Nick told the probation officer at the PSI, *see PSR*, ¶ 90, was that he "never, never blamed where he was from" for his own failures. This is a young man who ran for office at the age of 19. He left the race for the Army but could not join because of the eye his stepfather took from him. This is a young man who was raising a daughter by himself at 22. This is a young man who, unlike his stepfathers, has becoming a loving and devoted father to his wife's children. He nearly lost another daughter at birth and after struggling to pay her medical bills, adopted a teenage boy into his home, on top of the five mouths he already had to feed. His motive: "I just want to make things better for everybody." The behavior in this case must be corrected. But this record supports a bulwark against re-offense more powerful than any jail or condition can: a deep sense of a goodwill, generosity, and commitment to the well being of others that cannot be taught. Nick is already well on his way to rehabilitation, and this Court's sentence should nourish that. A sentence of probation is sufficient but not greater than necessary.

22

Respectfully submitted,

THE DEFENDANT,
Nicholas DeFelice

OFFICE OF THE FEDERAL DEFENDER

Dated: February 7, 2025

/s/ Daniel M. Erwin
Daniel M. Erwin
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct28947
Email: Daniel_Erwin@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 7, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Daniel M. Erwin*
Daniel M. Erwin